State v. Ross.

---

THE STATE v. ROSS, COLLECTOR OF PRINCETON.

1. The dwelling houses erected by the college of New Jersey for the accommodation of the professors and steward, are exempted from taxation, by the exemption in the act of 1851, exempting all colleges, academies, or seminaries of learning, and the lands whereupon the same are erected.

2. An academy or seminary kept by an individual on his own account, and at his own risk, not being a common public school, or incorporated, is not an academy or seminary, within the meaning of the exemption in the tax act of 1851.

This was a *certiorari* removing the assessment of county and township taxes made upon the property of the College of New Jersey, in the borough of Princeton, including the property occupied by their tenants as an academy or grammar school, at Edgehill, for his own profit.

The facts fully appear in the opinion of the court, delivered by Justice HAINES, before whom and Justice OGDEN the cause was argued.

HAINES, J.. The *certiorari* in this case brings up the assessments of taxes made by the assessor of the township of Princeton, upon certain property belonging to the trustees of the College of New Jersey, for the year 1852.

By the return, it appears that the trustees were assessed for the dwelling houses and grounds occupied by the president and vice-president of the college, and by the professors and steward; and also for the property known as "Edgehill," occupied as a grammar school by an individual, at an annual rent. The buildings occupied by the students, the halls of the literary societies, the chapel, library, philosophical halls, and *campus* are included in the assessment.

By the second section of the act of 14th March, 1851, which is a supplement to "an act concerning taxes," all lands and all personal estate within this state, whether owned by individuals or by corporations, are made liable to taxation, subject to the exemptions therein specified. This property, therefore, was lawfully taxed, unless it be fairly within the exemption clause.

The second paragraph of the 5th section mentions, among the property exempted, "all colleges, academies or seminaries of learning, and all buildings erected and used for religious purposes, the lands whereupon the same are erected, the furniture thereof, and the personal property used therein."

The term college, as here used, is not to be taken in its general sense, and as signifying an assemblage of persons for any political or ecclesiastical purpose; but in its more

usual acceptation, a college of learning. Nor in that sense, does it mean the assemblage of the professors and students; nor yet the trustees in their corporate capacity; but certain property belonging to them, edifices and the lands whereon the same are erected. ·

The question then arises—What buildings and lands are included in that term?

If it be limited to such buildings as are indispensable to a seminary of learning, their dormitories and refectories must be excluded, for they are not essential, and we know of one in our state, which is in successful operation, without either. If the term be not confined to the mere lecture or recitation room, then it must be so construed, as intended to include every thing necessary to the proper management of the institution, according to the plan and principles on which it was originally founded, or by authority subsequently adopted.

The charter of the college was granted by George II., on the 14th September, 1748, on the petition of " sundry well disposed and public spirited persons," in which they expressed their earnest desire, " that a college might be erected in the province of New Jersey, for the benefit of the inhabitants thereof and others, wherein youth might be instructed in the learned languages, and in the liberal arts and sciences," and " those of every religious denomination might have free and equal liberty, and advantages of education ;" " any different sentiments of religion notwithstanding." For such purposes the persons therein mentioned, and their successors were incorporated, by the name of " The Trustees of the College of New Jersey ;" and they were authorized " to acquire, receive and possess lands, and to purchase, receive or build any house or houses, or any other buildings, as they should think needful or convenient for the use of the said college, and in such place or places as they, the said trustees should agree upon," " so, nevertheless, that the clear yearly value of the premises should not exceed the sum of two thousand pounds sterling."

By the act of the legislature of 27th May, 1790, (*Pamph. Laws*, 383,) this charter, with certain modifications, but chiefly such as became necessary, by reason of the change of the state government, was ratified and confirmed to the trustees and their successors, with all the advantages, privileges and immunities thereby granted ; and they were authorized to hold any estate whatsoever, the clear yearly value whereof should not exceed twenty thousand dollars.

Under this charter, thus confirmed, the trustees purchased real estate at Princeton, and deemed it both "needful and convenient" for the use of the college to purchase or build not only the dormitories and apartments for the students, recitation rooms, and refectory, but also dwelling houses for the president, professors and students. Their plan was to board and lodge, as well as to instruct the students, and as convenient to that purpose, and needful, as well for economy as the proper government of the institution, to provide places of residences for their president, professors, steward and servants. The charter authorized the appointment of tutors and professors to assist the president in the education and government of the students.

Government was regarded as coördinate with education, and indispensable alike to the success of the enterprise, to the prosperity of the institution, and to the welfare of the youth. To enable the officers to exercise the proper discipline, it was necessary that they should dwell in the proximity of the students; and be provided with apartments either in the same buildings with them, or in dwelling houses adjacent.

It was neither agreeable nor proper that the president and professors, with their families, should be required to dwell in the same buildings with the students ; and therefore the trustees deemed it "needful and convenient" to provide separate houses for them ; and for like reasons, the steward, as an officer necessary to the boarding department, was furnished with a dwelling house for himself and family.

This plan of conducting the college had been adopted long before, and was in full operation at the time of the

passage of the act under which the tax in question was assessed; and it is presumed to have been known to the legislature, and these are their views.

They regarded the colleges of the state and seminaries of learning, as institutions " founded for the benefit of the inhabitants thereof," and as the means of promoting their prosperity and happiness, and so entitled to be exempted from the burden of taxation.

It was the policy of the state, and the intention of the legislature, to treat them with liberality, and in using the term college, they meant the institutions established in accordance with the terms of their respective charters, fairly and liberally construed.

The providing of these dwelling houses was clearly within the scope of the authority given by the charter, and they are to be taken as a part of the college, and together with the lands whereon they are erected, must be considered to be within the exemptions of the act.

The land attached to the houses constitutes but little more than the curtilage, and if not absolutely necessary to the enjoyment, it was by the trustees deemed to be " convenient " and appropriate.

This construction is not changed by the fact that the buildings in question were upon lots enclosed by substantial fences, and some of them separated by those fences, and others by a lane and public street from the other college grounds. The charter does not require that these lands should be in one enclosure or in one place even, but it expressly allows them to be in such place or places, in New Jersey, as the trustees should agree upon.

Nor is it changed by reason of the houses and lots not being for the common use and occupation of the students and teachers, but occupied as the private residences of the professors and their families, and placed under their care and culture, and the products of the grounds devoted to their benefit, and as part of their emolument or compensation for official service.

If the trustees deemed it either necessary or convenient to erect or purchase such buildings, and to have them so occupied, by the terms of their charter, as we have seen, they might do so.

Providing separate houses for their professors, was no more a violation of the charter, than was the providing separate rooms in the dormitories for the tutors. The separate rooms, and the several houses, were under the control and for the exclusive use of the tutors and professors, severally, and held by the same tenure, to wit—at the will of the trustees, not at a rent, but as part of the consideration for their services.

The charter authorizes the trustees not only to elect their president, tutors and professors, steward and other officers, but at any time to displace and discharge them from their service.

These officers, therefore, occupy their respective houses or rooms by permission of the trustees, and during their pleasure, subject to be removed at will from their offices and the apartments.

Their tenure differs from that of Professor Pierce of Harvard College, who occupies a house and lot of land belonging to the college, as a tenant, from year to year, at an annual rent of $400. He was taxed for the house and lot he so held, under the statutes of Massachusetts, which exempted from taxation "the personal property of all literary, charitable and scientific institutions," "and such real estate belonging to such institutions as shall be actually occupied by them and by the officers of such institution, for the purposes for which they were incorporated."

The court, as reported in *Pierce* v. *The Inhabitants of Cambridge*, 2 *Cushing R.* 611, held that the professor was bound to pay the tax, because, as a tenant, from year to year, he had an estate in possession, and the college only a reversionary interest. The judge who delivered the opinion of the court, remarked, however, "that it would be otherwise if the building had been built for one of the professors or officers of the college, and been occupied by the permission of the

college, without having any estate therein, or paying any rent therefor." If the statute under which that tax was assessed was precisely like our own, the opinion of the court would seem to favor the construction of our statute as above given. The case of *The Harvard College* v. *Kettell*, 16 *Mass. R.* 207, was under a statute so different from our own, and the opinion so indefinite, that it can have no weight in determining the case before us.

So far then as relates to the houses and lots occupied by the president, professors, steward and students, the assessment must be set aside.

But the property known as "Edge Hill," does not come within the exemption. It is not a part of the college, nor necessary to the plan and principles on which it is founded.

It may have been profitable to the college, and a source of satisfaction to the trustees and professors, by its contributions of well prepared students; but it was not necessary to its success, nor to the accomplishment of its plans and the objects of its charter.

This distinction was well taken by Justice POTTS, in *The State* v. *The Commissioners of Mansfield*, 3 *Zab.* 512.

The question involved in that case was the right to tax certain dwelling houses in the township of Mansfield, owned by the Camden and Amboy Railroad and Transportation Co., situated near the line of the road, and used exclusively by workmen and mechanics in the employment of the company; and it was held, that "although grants of corporate powers are to be strictly construed, yet they are not to be so construed as to defeat the object of the grant; hence all such powers, in addition to those expressly granted, as are strictly incidental and necessary to that object, are implied.

"The necessary appendages of a railroad and transportation company are one thing, and those appendages which may be convenient means of increasing the profits and advantages of the company, are another thing.

"It might be advantageous to the company to purchase land and to erect houses in the right location, and of the right kind, for all their employees; to establish factories for

making their own rails, engines and cars, even to purchase coal mines and supply themselves with fuel, but these are not among the necessary powers of the company."

Nor can the Edge Hill property be brought within the other part of the exempting clause. It is neither an academy nor a seminary of learning, within its meaning. It is not incorporated, nor maintained in whole or in part at the expense of the public.

It is a tract of some thirteen acres of land, occupied by an individual as the lessee of the trustees. Upon it the tenant kept a private grammar school on his own account, and at his own risk, and has no other claim to the privilege of the statute than any other private school in the State.

If the collector can ascertain, or the parties can agree upon the amount of tax assessed upon the Edge Hill property, that part is to be retained by the collector. If that cannot be ascertained or agreed upon, commissioners must be appointed under the act in such case provided, to determine it.

OGDEN, J., concurred.